# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| SEALED, | § | |
| Plaintiffs, | § | Civil Action No. |
| | § | 4:18CV116 |
| | § | |
| | § | |
| | § | **FILED *IN CAMERA*** |
| | § | **AND UNDER SEAL** |
| v. | § | |
| | § | |
| SEALED, | § | Pursuant to |
| Defendant. | § | 31 USC §3730(b)(2) |
| | § | |
| | § | Jury Trial Demanded |

# ATTENTION SEAL CLERK

# FILED IN CAMERA AND UNDER SEAL

# FALSE CLAIMS ACT COMPLAINT

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA, and the STATE OF TEXAS, ex rel. JASON BREZINA AND GLORIA ELIZABETH KELLY, | Case No. _____ |
| Plaintiffs, | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| vs. | **JURY TRIAL DEMANDED** |
| CURO HEALTH SERVICES, LLC, AVALON HOSPICE, COMMUNITY HOME CARE & HOSPICE, SOUTHERNCARE HOSPICE SERVICES, HOSPICE PLUS, REGENCY HOSPICE, NEW CENTURY HOSPICE, REGENCY SOUTHERNCARE HOSPICE, HOSPICE FAMILY CARE, AND SOUTHERNCARE NEW BEACON HOSPICE | |
| Defendants. | |

## FALSE CLAIMS ACT COMPLAINT

### I.
### INTRODUCTION

1.      Plaintiff-Relators Jason Brezina and Gloria Elizabeth Kelly ("Plaintiff-Relators" or "Relators") bring this action on behalf of the United States of America and the State of Texas, and on their own behalf, against Defendants, Curo Health Services, LLC and its affiliates Avalon Hospice, Community Home Care & Hospice, SouthernCare Hospice Services, Hospice Plus, Regency Hospice, New Century Hospice, Regency SouthernCare Hospice, Hospice Family Care, and SouthernCare New Beacon Hospice (hereinafter collectively referred to as "Curo"), as described in greater detail below.

2.      This action is filed as a result of the Defendants' violations of 31 U.S.C. §§ 3729 *et seq.* (the "federal False Claims Act" or the "FCA") and the Texas Medicaid Fraud Prevention

2

Act, Texas Human Resource Code §§36.001 *et seq.* ("TMFPA."), which resulted in significant monetary damages to the United States and the State of Texas.

3.      One purpose of this Complaint is to correct the wrongdoings of Curo and the other participants in the schemes described in this Complaint, everywhere in the nation.

4.      Many of the patients at Curo hospices receive healthcare coverage through the States' Medicaid programs (paid with both state and federal funds), the federal Medicare and Tricare/Champus programs, and other federally funded governmental healthcare programs (sometimes collectively referred to herein as "Governmental Healthcare Programs.")

5.      Each of these schemes violates the federal False Claims Act and the States' False Claims Acts, by causing the submission of false claims to and other unlawful acts against Government Healthcare Programs through Defendants' false claims, false statements, false reports, false certifications, and other wrongful acts, as described in greater detail below.

6.      Defendants' specific wrongful acts include, in addition to other acts described herein, submitting false claims for payment, or causing the submission of false claims for payment to Government Healthcare Programs, and submitting false certifications to Government Healthcare Programs with those claims for payment.

7.      As a direct result of Defendants' improper practices in violation of the FCA and the State FCAs, the treasuries of the United States and the States have been damaged in a substantial amount yet to be determined.

8.      Plaintiff-Relators, on behalf of the United States, the State of Texas and themselves, seek treble damages, civil penalties, and other relief arising from Defendants' false claims made in violation the federal FCA and Defendants' unlawful acts made in violation of the State FCAs.

9.      Both Relators have worked for Curo, and still do.  Through their experiences at work, the Relators learned of Defendants' illegal schemes.

3

10.     Relators possess direct and independent knowledge about Defendants' wrongful acts against the federal and state governments by submitting false claims and committing other unlawful acts with respect to the Government Healthcare Programs. If a public disclosure of Relators' allegations was made prior to filing this suit, Relators are nevertheless the original source of any such allegations or disclosures.

11.     Prior to filing this lawsuit, on or about February 5, 2018, Relators voluntarily disclosed substantially all material evidence and information the Relators possess when they served a Disclosure Statement on the required governmental officials.

12.     This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements, and claims made and caused to be made by Defendant and/or its agents and employees in violation of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*.

13.     Defendants have engaged in a systematic scheme to defraud the United States by fraudulently billing government-funded health care programs for hospice care that was billed in violation of the rules of Medicare, Medicaid and other government-funded healthcare programs.

14.     Since at least 2011, Curo has fraudulently billed Medicare, Medicaid, and other government-funded health care programs for hospice care. Since at least 2011, Curo has billed Medicare and other government providers for services, despite knowing that the patients were not eligible for Medicare coverage of these services because they did not meet Medicare's eligibility requirements and/or no physician's narrative had been obtained.

15.     Defendants have submitted and caused to be submitted thousands of false and fraudulent claims to federal and state-funded health care programs for hospice services.  Each submission is a false or fraudulent claim in violation of the federal False Claims Act.

16.     The federal False Claims Act (the "FCA") was originally enacted during the Civil War.  Congress substantially amended the Act in 1986 – and, again, in 2009 and 2010 – to enhance the ability of the United States Government to recover losses sustained as a result of

fraud against it.  The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization.  Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

17.     The FCA prohibits, _inter alia_: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; (c) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property; and (d) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.  31 U.S.C. §§ 3729(a)(1)(A), (B), (D), and (G).  Any person who violates the FCA is liable for a civil penalty for each violation, plus three times the amount of the damages sustained by the United States.  31 U.S.C. § 3729(a)(1).

18.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery.  The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

19.     Based on the foregoing law, _qui tam_ Plaintiff-Relators Jason Brezina and Gloria Elizabeth Kelly seek, through this action, to recover damages and civil penalties arising from the false or fraudulent records, statements and/or claims that the Defendant made or caused to be

made by billing Medicare, Medicaid, and other government-funded healthcare programs for medically unnecessary or improperly billed hospice services.

## II.
## PARTIES

**Plaintiff-Relators**

20.     Plaintiff-Relator Gloria Elizabeth Kelly is a resident of Grand Prairie, Texas. She is a Registered Nurse, having graduated with honors from the El Centro School of Nursing in Dallas, Texas, in 1995.   She has worked in hospice care settings almost continuously since September 1997. From March 2001 to October 2007, Kelly served as Director of Patient Services at American Hospice in Dallas, Texas. She also served as a Supervising Nurse and as Direct of Operations at Hospice Plus in Arlington, Texas, now an affiliate of Curo.

21.     From December 2007 to the present, Relator Kelly has served as Director of Operations ("DOO") for Tarrant County Regions at Hospice Plus. Her job duties included directing all aspects of business, fiscal, and clinical operations; recruitment and education of clinical staff; responsibility for state and federal compliance; on-going education of clinical staff in all areas of clinical competence including hospice philosophy, patient care, documentation, end-of life symptom management, and self- care for clinical staff; training and mentoring new DOOs in the Tarrant Counties Region of Hospice Plus; and assisting with billing for care provided by Hospice Plus. Her role at Hospice Plus and her job duties there positioned her to personally view many bills charged to insurers, including Medicare and Medicaid. Relator Kelly personally saw hundreds of bills inappropriately submitted by Curo to government-funded healthcare programs.

22.     Plaintiff-Relator Jason Brezina is a resident of Fort Worth, Texas.  He graduated from the University of Texas at Arlington in 1998, with a Bachelor of Science in Nursing. He began working as a Nursing Supervisor/ICU Nurse in December 1998. In September 2001, he moved into marketing, having accepted a position as Area Sales Manager for the same hospital system where he had been serving as a nurse. In November 2009, Brezina became Area Director of Business Development for Hospice Plus (now owned by Curo) and continues in that position today.

23.     The essential functions of Brezina's position involved him in the process of determining client needs and identifying best solutions. Therefore, he was in regular contact with physicians whose patients might require hospice services, as well as the nurses and other medical professionals who worked for Hospice Plus/Curo. He understands Curo admissions procedures and was in regular contact with Curo staff who implemented those procedures. He also knows the Medicare requirements regarding eligibility of patients to have hospice services paid by Medicare. Through personal observation and discussions with many Curo staff, he learned of the FCA and TMPA violations described in this Disclosure Statement. Relator Brezina was also a part of the leadership team at the same Curo office where Relator Kelly worked. He also learned of Curo's FCA violations through information he received in that role.

**Defendants**

24.     Defendant Curo Health Services, LLC is a limited liability company created in Delaware by conversion of a Delaware corporation under the name of Curo Health Services, Inc. to a Delaware limited liability company, filed with the Delaware Secretary of State on November 8, 2011.

25.     Defendant Curo Health Services, LLC is headquartered in Mooresville, North Carolina. Curo Health Services, LLC (fka Curo Health Services, Inc.) owns and operates hospice

centers in 22 states.[1] It works in concert with at least nine affiliates. Hereinafter, "Curo" or "Defendant" is intended to refer to Curo Health Services, LLC and any and all subsidiaries, affiliates (including but not limited to the Defendant subsidiaries named in this suit), or assumed names or trademarks under which it conducts business.

26.     Defendant Community Home Care & Hospice is an affiliate of Curo Health Services, LLC, that operates many locations in North Carolina.  Community Home Care & Hospice can be served at 533 S Fayetteville St., Asheboro, NC 27203.

27.     Defendant Avalon Hospice is an affiliate of Curo Health Services, LLC, that operates many locations in Tennessee, Kansas, Missouri, Iowa, Ohio, and Illinois.  Avalon Hospice can be served at 1850 Executive Park Dr. NW, Suite B, Cleveland, TN 37312.

28.     Defendant SouthernCare Hospice Services is an affiliate of Curo Health Services, LLC, that operates many locations in Alabama, Wisconsin, Ohio, Indiana, Pennsylvania, Louisiana, Michigan, Mississippi and Texas.  SouthernCare Hospice Services can be served at 1253 Rucker Blvd., Suite A, Enterprise, AL 36330.

29.     Defendant Hospice Plus is an affiliate of Curo Health Services, LLC, that operates many locations in Texas. Hospice Plus can be served at 3100 McKinnon St., Suite 200, Dallas, Texas 75201.

30.     Defendant Regency Hospice is an affiliate of Curo Health Services, LLC, that operates locations in Florida.  Regency Hospice can be served at 50 Beverly Parkway, Suite 200, Pensacola, Florida 32505.

31.     Defendant New Century Hospice is an affiliate of Curo Health Services, LLC, that operates many locations in Virginia, Texas, Colorado, Louisiana, Oklahoma and Delaware. New Century Hospice can be served at 4101 McEwen Rd., Suite 500, Dallas, Texas 75244.

---

[1] The Curo website states that it operates in the following states: Alabama, Arizona, Colorado, Delaware, Florida, Georgia, Iowa, Illinois, Indiana, Kansas, Louisiana, Michigan, Missouri, Mississippi, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and Wisconsin.

32.     Defendant Hospice Family Care is an affiliate of Curo Health Services, LLC, that operates locations in Arizona.  Hospice Family Care can be served at 1550 S. Alma School Road, Suite 102, Mesa, Arizona 85210.

33.     Defendant Regency SouthernCare Hospice is an affiliate of Curo Health Services, LLC, that operates locations in Georgia and South Carolina.  Regency SouthernCare Hospice can be served at 2924 Professional Parkway, Augusta, Georgia 30907.

34.     Defendant SouthernCare New Beacon Hospice is an affiliate of Curo Health Services, LLC, that operates many locations in Alabama.  Southerncare New Beacon Hospice can be served at 1280 Columbiana Road, Suite 110, Birmingham, Alabama 35216.

### III.
### JURISDICTION AND VENUE

35.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  In addition, 31 U.S.C. § 3732(b) vests this Court with jurisdiction over the state law claims asserted in this Complaint.

36.     Under 31 U.S.C. § 3730(e), and the analogous provisions of Texas' Medicaid Fraud Prevention Act, if and to the extent that there has been any public disclosure of the allegations or transactions at issue in this Complaint, Relators are the original source of the allegations herein because: (a) prior to a public disclosure they voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based; and/or (b) they have knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and they voluntarily provided the information to the Government before filing this Complaint.

37.     This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because Defendant has minimum contacts with the United States.  Moreover, Defendant can be found in and has transacted business in the Eastern District of Texas.

38.     Venue is proper in the Eastern District of Texas pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because Defendant can be found in and transacts business in this district.  At all times relevant to this Complaint, Defendant regularly conducted, and continues to conduct, substantial business within this district and/or maintains employees and offices in this district.

## IV.
## APPLICABLE LAW

### A.     Federal and State-Funded Health Care Programs

39.     Various federal and state health care programs pay for hospice services as described in this Complaint.  Examples of such payer programs include the following:

### 1.     The Medicare Program

40.     Medicare is a federally-funded health insurance program which provides for certain medical expenses for persons who are over 65, who are disabled, or who suffer from End Stage Renal Disease.  The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

41.     The Medicare program has four parts: Part A, Part B, Part C and Part D. Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care.  Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, such as services provided to Medicare patients by physicians, laboratories, and

diagnostic testing facilities. *See* 42 U.S.C. §§ 1395k, 1395l, 1395x(s). Medicare Part C covers certain managed care plans, and Medicare Part D provides subsidized prescription drug coverage for Medicare beneficiaries.

42.     To administer the Medicare program, private insurance companies act as agents of the Department of Health and Human Services, making payments on behalf of the program beneficiaries and providing other administrative services. 42 U.S.C. §§ 1395h and 1395u. These companies are called "carriers." 42 C.F.R. § 421.5(c). Through local carriers, Medicare establishes and publishes the criteria for determining what services are eligible for reimbursement or coverage. This information is made available to the providers who seek reimbursement from Medicare.

43.     Medicare reimburses health care providers for the costs of providing covered health services to Medicare beneficiaries. *See* 42 U.S.C. § 1395x(v)(1)(A). In order to bill Medicare Part B, a provider must submit an electronic or hard-copy claim form called the CMS 1500 (formerly known as HCFA 1500) to the appropriate Medicare carrier. The form describes, among other things, the provider, the patient, the referring physician, the service(s) provided by procedure code, the related diagnosis code(s), the dates of service, and the amount charged. The provider certifies on the CMS 1500 claim for that the information provided is truthful and that the services billed on the form were "medically indicated and necessary."

44.     In addition, each Medicare provider must sign a provider agreement as a condition of participation, and by so doing must agree to comply with all Medicare requirements including the fraud and abuse provisions. A provider who fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicare patients.

45.     Curo understands the conditions of participation in the Medicare and Medicaid programs. The Curo Code of Conduct explains it very clearly.

46.     The Curo Code of Conduct also provides employees with explanations of the FCA, the Anti-Kickback Statute, the Stark Law, and the Civil Monetary Penalties Law, explaining,

47.     At all times relevant to this action, the local carriers that reviewed and approved the claims at issue in this case based their review upon the enrollment information and claim information provided by the Defendants, and relied on the veracity of that information in determining whether to pay the claims submitted by Defendant.

### 2.     The Medicaid Program

48.     Medicaid is a public assistance program providing for payment of medical expenses for low-income and disabled patients.   Funding for Medicaid is shared between the Federal Government and those states participating in the program.

49.     Federal regulations require each state to designate a single state agency responsible for the Medicaid program.  The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of HHS ("the Secretary").  Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines.  Federal statutes and regulations restrict the items and services for which the federal government will pay through its funding of state Medicaid programs.

50.     Each provider that participates in the Medicaid program must sign a provider agreement with his or her state.  For example, the Texas Health and Human Services Commission requires any prospective Medicaid provider to certify that: (1) its "claims or

12

encounter data will be true, accurate, and complete;" and (2) its records and documents will be "accessible and validate the services and the need for the services billed and represented as provided."

### 3. Other Federally Funded Health Care Programs

51.     The Federal Government administers other health care programs including, but not limited to, TRICARE/CHAMPUS, CHAMPVA, the Federal Employee Health Benefit Program, and federal workers' compensation programs.

52.     TRICARE/CHAMPUS, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces. 10 U.S.C. §§ 1071 *et seq.*; 32 C.F.R. § 199.4(a).

53.     CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected disability.  38 U.S.C. §§ 1781 *et seq.*; 38 C.F.R. § 17.270(a).

54.     The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors.  10 U.S.C. §§ 1071 *et seq.*; 32 C.F.R. § 199.4(a).

55.     The Federal Employees' Compensation Act provides workers' compensation coverage, including coverage of medical care received as a result of a workplace injury, to federal and postal employees.  The Act is administered by the Department of Labor, Division of Federal Employees' Compensation.  5 U.S.C. § 8101 *et seq.*; 20 C.F.R. § 10.0 *et seq.*

13

**B.** **The Government Only Pays for Medical Services which are Reasonable, Necessary, and Meet the Requirements for Billing**

56.     Medicare only pays for services that are "medically necessary" – i.e., Medicare requires as a condition of payment that services be "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A).

57.     Further, providers who wish to participate in the Medicare program must ensure that their services are provided "economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a)(1).

58.     Providers may be excluded from participation in the Medicare program and other federally-funded health care programs, if they routinely bill Medicare for medically unnecessary items or services. See 42 CFR § 1003.102.

**C.** **Duty of Providers To Submit Truthful Bills and To Correct Known Errors and Falsehoods in Prior Bills**

59.     Federal law prohibits providers from making "any false statement or representation of a material fact in any application for any . . . payment under a Federal health care program." See 42 U.S.C. § 1320a-7b(a)(1).

60.     Similarly, federal law requires providers who discover material omissions or errors in claims submitted to Medicare, Medicaid, or other federal health care programs to disclose those omissions or errors to the Government. See 42 U.S.C. § 1320-a-7b(a)(3).

61.     The requirement that providers be truthful in submitting claims for reimbursement is a precondition for participation in the Medicare program, the Medicaid program and other federally-funded health care programs. See, e.g., 42 CFR §§ 1003.105, 1003.102(a)(1)-(2).

### D.    Duty of Providers To Return Overpayments

62.    In 2009, Congress passed the Fraud Enforcement and Recovery Act, Pub. Law 111-21, 123 Stat. 1617 (2009) ("FERA"). FERA extensively amended the FCA, including by adding a provision known as the reverse false claims provision.

63.    The amended FCA provides that a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government" is liable to the U.S. for civil penalties and treble damages. 31 U.S.C. § 3729(a)(1)(G)

64.    FERA amended the FCA by including the following definition of "obligation."

"an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment" 31 U.S.C. § 3729(b)(3))

65.    Recipients of Medicare and Medicaid funds who have "received an overpayment" must "report and return the overpayments" to HHS or the State, as appropriate. 42 U.S.C. § 1320a-7k(d)(1).

66.    An "overpayment must be reported and returned" within "60 days after the date on which the overpayment was identified." 42 U.S.C. § 1320a-7k(d)(1)-(2)

### E.    Rules Governing Payment for Hospice Services

67.    Medicare allows payment on a monthly basis for hospice services under certain conditions.  The conditions are included in 42 CFR 418.22 which states as follows:

(a)    *Timing of certification* -
        (1)    *General rule.* The hospice must obtain written certification of terminal illness for each of the periods listed in § 418.21, even if a single election continues in effect for an unlimited number of periods, as provided in § 418.24(c).

15

(2) *Basic requirement.* Except as provided in paragraph (a)(3) of this section, the hospice must obtain the written certification before it submits a claim for payment.

(3) *Exceptions.*

(i) If the hospice cannot obtain the written certification within 2 calendar days, after a period begins, it must obtain an oral certification within 2 calendar days and the written certification before it submits a claim for payment.

(ii) Certifications may be completed no more than 15 calendar days prior to the effective date of election.

(iii) Re-certifications may be completed no more than 15 calendar days prior to the start of the subsequent benefit period.

(4) *Face-to-face encounter.* As of January 1, 2011, a hospice physician or hospice nurse practitioner must have a face-to-face encounter with each hospice patient whose total stay across all hospices is anticipated to reach the 3rd benefit period. The face-to-face encounter must occur prior to, but no more than 30 calendar days prior to, the 3rd benefit period recertification, and every benefit period recertification thereafter, to gather clinical findings to determine continued eligibility for hospice care.

(b) *Content of certification.* Certification will be based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness. The certification must conform to the following requirements:

(1) The certification must specify that the individual's prognosis is for a life expectancy of 6 months or less if the terminal illness runs its normal course.

(2) Clinical information and other documentation that support the medical prognosis must accompany the certification and must be filed in the medical record with the written certification as set forth in paragraph (d)(2) of this section. Initially, the clinical information may be provided verbally, and must be documented in the medical record and included as part of the hospice's eligibility assessment.

(3) The physician must include a brief narrative explanation of the clinical findings that supports a life expectancy of 6 months or less as part of the certification and recertification forms, or as an addendum to the certification and recertification forms.

(i) If the narrative is part of the certification or recertification form, then the narrative must be located immediately prior to the physician's signature.

(ii) If the narrative exists as an addendum to the certification or recertification form, in addition to the physician's signature on the certification or recertification form, the physician must also sign immediately following the narrative in the addendum.

(iii) The narrative shall include a statement directly above the physician signature attesting that by signing, the physician confirms that he/she composed the narrative based on his/her review of the patient's medical record or, if applicable, his/her examination of the patient.

16

(iv) The narrative must reflect the patient's individual clinical circumstances and cannot contain check boxes or standard language used for all patients.

(v) The narrative associated with the 3rd benefit period recertification and every subsequent recertification must include an explanation of why the clinical findings of the face-to-face encounter support a life expectancy of 6 months or less.

(4) The physician or nurse practitioner who performs the face-to-face encounter with the patient described in paragraph (a)(4) of this section must attest in writing that he or she had a face-to-face encounter with the patient, including the date of that visit. The attestation of the nurse practitioner or a non-certifying hospice physician shall state that the clinical findings of that visit were provided to the certifying physician for use in determining continued eligibility for hospice care.

(5) All certifications and re-certifications must be signed and dated by the physician(s), and must include the benefit period dates to which the certification or recertification applies.

(c)  *Sources of certification.*

(1) For the initial 90-day period, the hospice must obtain written certification statements (and oral certification statements if required under paragraph (a)(3) of this section) from -

(i) The medical director of the hospice or the physician member of the hospice interdisciplinary group; and

(ii) The individual's attending physician, if the individual has an attending physician. The attending physician must meet the definition of physician specified in § 410.20 of this subchapter.

(2) For subsequent periods, the only requirement is certification by one of the physicians listed in paragraph (c)(1)(i) of this section.

(d )  *Maintenance of records.* Hospice staff must -

(1) Make an appropriate entry in the patient's medical record as soon as they receive an oral certification; and

(2) File written certifications in the medical record.

## V.
## ALLEGATIONS

68.     In December 2014, Curo knew that it was not complying with the Medicare regulations and had billed Medicare for hospice services without the required physician's certificate of terminal illness ("CTI"). Curo began what it called a "Quality Initiative" mandating that 100% of physician narratives in the CTIs be audited.  Those found to lack quantifiable

clinical data to determine hospice eligibility would be amended after the fact by adding an "addendum" signed by the physician or medical director.

69.     On December 16, 2014, Relator Kelly and her counterpart DOOs at other Curo locations received an email from Melissa Stocker, the Corporate Compliance Officer at Curo, describing the deficiencies in billing and a corrective action plan. Stocker also explained clearly and accurately the regulatory applicable requirements.

70.     The information about Medicare requirements should not have been a surprise to Curo staff. The same requirements are clearly stated in Curo's "Hospice Admissions Policy" dated March 1, 2012.

71.     Stocker also provided spreadsheets to each DOO, listing active patients that did not yet have a CTI that met Medicare requirements. Two specific deficiencies were numerous. Either there was no CTI or there was not a signature by a physician.

72.     In addition to the spreadsheets, the DOOs were given a "DOO Physician Narrative Action Plan." The Action Plan required DOOs, and others who might cover shifts for them, to view computer based training courses by December 31, 2014, entitled "Documenting Clinical Eligibility and Recertification in Hospice" and "The Physician Narrative." Curo Medical Directors were not required to view these courses, but the Action Plan encouraged the DOOs to invite their Medical Directors to view "The Physician Narrative."

73.     The training gave DOOs detailed instructions about how to correct the non-compliant CTIs. The DOOs were instructed to re-educate the physicians, provide examples of compliant narratives, and have the physicians compose an addendum for all non-compliant or non-existing CTI narratives.

74.    As Supervising Nurse for Hospice Plus, Kelly was recruited to assist other Curo offices that were unable to follow this process or had an unusually high percentage of CTIs that were found to be out of compliance. Thus, Relator Kelly saw not only the spreadsheets that were applicable to her region, but also saw spreadsheets applicable to Curo locations elsewhere. From this information, she knew that the problem was universal across the Curo system, nationwide.

75.    While assisting the Hospice Plus offices, Kelly found that there were frequently situations in which a claim had been billed to Medicare without the required CTI Narrative. Addenda were added to patient records long after billing was completed for the episode.  It was clear that Curo knew sometime before Stocker sent the email on December 16, 2014, that it had billed Medicare and been paid by Medicare for hospice services provided to patients that were ineligible.

76.    The FERA amendment to the FCA required Curo to reimburse Medicare for incorrect payments within 60 days of discovering that an incorrect payment had been made by Medicare.  Instead of complying with that requirement, Curo undertook a plan to falsify its files by creating the missing CTI or correcting incomplete CTI after the fact, to protect itself from the cost that would have been imposed by the FERA reimbursement requirement.  Curo told its employees that "this was "not an issue of eligibility, but of documentation quality improvement."

77.    Curo's Electronic Medical Record ("EMR") system would not allow a bill to be created for Medicare unless the physician's narrative was composed, properly signed, and filed in the EMR system. During the "quality initiative," Curo discovered (and Kelly saw) that many of the physicians' notes were not, in fact, physicians' notes at all. The notes in the medical record were actually nurses' notes that had been copied into the window in the software system for storing the physicians' notes. Those notes were signed electronically. Medicare and Medicaid

were billed, meaning Curo submitted claims to Medicare and Medicaid, based on this false documentation. Nurses' notes were used by Curo to substitute for a physican's narrative, in order to prevent a billing hold that would otherwise have been automatically implemented by the EMR system.

78.     Curo employed a clever strategy to prevent the EMR system from blocking the creation of a bill for a patient whose medical record lacked a proper CTI. The regulations allow a paper, rather than electronic, CTI. For those circumstances, the EMR system included a check box that noted the use of a paper CTI. Curo could, and did, simply check that box and the EMR system would not block the creation of a bill to Medicare or Medicaid. But too often, the requisite CTI did not exist.

79.     Thus, the "quality initiative" uncovered the fact that there were instances where the CTI was signed without any narrative at all, even though a narrative was required by 42 CFR § 418.22. Even though Medicare had already been billed and had paid, Curo found that there was no paper narrative in their system anywhere.

80.     In one specific instance, a particular female patient was provided hospice care from May 23, 2016 to July 21, 2016.  The audit showed that the narrative used for the CTI was a nurse note that was copied and pasted into the narrative field.  It was electronically signed by the physician and Medicare was billed for that time period.   No physician narrative had been composed for this patient before a claim was submitted to Medicare. Instead of reimbursing Medicare for the payment it made on that claim, Curo composed an addendum in December 2016, and the physician signed it on December 21, 2016.

81.     On November 18, 2016, Melissa Stocker sent Kelly an email which confirmed that Stocker knew of multiple situations for which there were no physician's narratives.  She said "Please note June has 28 blank CTIs.  Sept. has 12.  Oct. Has 19."

82.     While Curo was finding these deficient records, at no time did it inform Medicare that it had billed Medicare without the information required by 42 CFR § 418.22.

83.     Kelly was recruited to assist with this process of addendum to deficient records for the Hospice Plus offices.  Her role was to educate the directors and physicians and help them become compliant with the PN process.  During that time, she discovered another frequent deficiency. Often the director (or a designee) at a Curo hospice was actually composing these addenda, instead of the physician or nurse required by the regulations.  She discussed this with Stocker and voiced concern that Curo had already billed the care but that there was no narrative ever composed by the physician.

84.     While assisting in this process, Kelly was given spreadsheets with hundreds of patients that indicated that this fraudulent behavior was a universal problem not limited to North Texas. Comparing the "Start of Episode" dates with the "Narrative Signed Date" on those spreadsheets reveals that Physician Narratives had not been composed before the admission of many patients at Curo. Indeed, many Physician Narratives had been composed after the end of patient episodes. This is also illustrated by Curo monthly status reports on Physician Narrative addenda.

85.     As recently as September 28, 2017, Stocker reported in an email to the North Texas Team (consisting of numerous personnel at different North Texas locations owned by Curo) that they still only had an 82% compliance score.  The compliance score for the previous

month was 81.8%.  The company goal is 98%.  One of the biggest areas of issue was with blank or copied CTIs.

86.     Relator Kelly personally saw bills that were sent to Medicare and Medicaid in precisely these sorts of situations.

87.     However, it was not just Relators and a select few who knew of Curo's violations. It was actually common knowledge in their office and the other Curo offices. The "quality initiatives" were discussed in company meetings and conference calls, and were an open topic of conversation among many at Curo.

88.     It is clear from Stocker's email of September 28, 2017, that Curo is still engaging in the same behavior that violates the FCA. As a result of an audit process that has been virtually continuous since at least December 2014, Curo leaves no open question about whether it knew its actions violated Medicare regulations and the FCA.

89.     After all that effort, Curo still had an 18% failure rate in September 2017. Yet instead of informing Medicare, Curo has continued to put tremendous effort into covering up its non-compliance.

90.     Claims to Medicare, Medicaid, or other government-funded health care programs for hospice services, made in knowing non-compliance with applicable requirements, including those claims submitted without having a physician's narrative in the medical record of a patient at the time required, are false and/or fraudulent under the Federal False Claims Act.

91.     Had the United States or the State of Texas known that Defendants violated the laws cited herein, they would not have paid the claims submitted by Curo in connection with Defendants' wrongful and illegal practices.

## VI.
## COUNTS AGAINST ALL DEFENDANTS

**Count I:**     **False Claims Act - 31 U.S.C. §§ 3729(a)(1)(A),(B), (D) and (G)**

92.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 78 above as though fully set forth herein.

93.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

94.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval. 31 U.S.C. §§ 3729(a)(1)(A)

95.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims. 31 U.S.C. §§ 3729(a)(1)(B)

96.    By virtue of the acts described above, Defendants knowingly concealed overpayments from the United States Government and failed to remit such overpayments. 31 U.S.C. §§ 3729(a)(1)(D) and (G).

97.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

98.    Had the United States known that Defendants violated the laws cited herein, the United States would not have paid the claims submitted by Curo in connection with Defendants' wrongful and illegal practices.

99.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

100.     Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

101.     Additionally, Plaintiff-Relators are entitled to reasonable costs, including attorneys' fees, for their role in bringing these FCA/FERA violations to the attention of the government.

**Count II:**     **FERA - 42 U.S.C. § 1320a-7k(d).**

102.     Relators re-allege and incorporate by reference the allegations contained in paragraphs 1 through 78 above as though fully set forth herein.

103.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

104.     By virtue of the acts described above, Defendants knowingly failed to report or return payments, for services provided to hospice patients for whom Curo had not established eligibility for payment by government health insurers. Such payments should have been reported and returned either 60 days after the date on which the overpayment was identified, or by the date any corresponding cost report was due. 42 U.S.C. § 1320a-7k(d)_and 31 U.S.C. §§ 3729(a)(1)(D) and (G).

105.     The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

106.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

107.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

108.    Additionally, Plaintiff-Relators are entitled to reasonable costs, including attorneys' fees, for their role in bringing these FCA/FERA violations to the attention of the government.

**Count III:    Violations of the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §§36.001 *et seq.*, Against All Defendants**

109.    Relators restate and re-allege the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

110.    This is a *qui tam* action brought by Relators on behalf of the State of Texas to recover treble damages and civil penalties under the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §§36.001 *et seq.*

111.    Tex. Hum. Res. Code §36.002, in part, provides liability for any person who:

(1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;
. . .

(4) knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:
. . .

(B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;
. . .

(9) conspires to commit a violation of Subdivision (1), (2), (3), (4), (5), (6), (7), (8),

25

(10), (11), (12), or (13);

. . . . .

or

(12) knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program.

112. Defendants violated Tex. Hum. Res. Code §36.002 and knowingly caused false claims to be made, used and presented to the State of Texas by their violations of Federal and State law as a result of their kickback scheme, their self-referral scheme, their provision of unnecessary medical services, and their false certifications.

113. The State of Texas, by and through the Texas Medicaid program and other State health care programs, was unaware of Defendants' wrongful and illegal practices and paid the claims submitted by health care providers and third party payers in connection therewith.

114. Compliance with applicable Medicare, Medicaid and various other Federal and State laws was an implied and also an express condition of payment of claims submitted to the State of Texas in connection with Defendants' wrongful and illegal practices.

115. Had the State of Texas known that Defendants violated the laws cited herein, it would not have paid the claims submitted by healthcare providers and third party payers in connection with Defendants' wrongful and illegal practices.

116. As a result of Defendants' violations of Tex. Hum. Res. Code §36.002, the State of Texas has been damaged to the extent of millions of dollars, exclusive of interest.

117. Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Tex. Hum. Res. Code §36.101 on behalf of themselves and the State of Texas.

118.   This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same facts as the federal claim, and merely asserts separate damages to the State of Texas in the operation of its Medicaid program.

## VII.
## PRAYER

WHEREFORE, Plaintiff-Relators Brezina and Kelly pray for judgment against the Defendant as follows:

119.   That Defendant cease and desist from violating 31 U.S.C. § 3729 *et seq.*

120.   That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $21,916 for each violation of 31 U.S.C. § 3729;

121.   That Plaintiff-Relators Brezina and Kelly be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act;

122.   That Plaintiffs-Relators Brezina and Kelly be awarded all costs of this action, including attorneys' fees and expenses; and

123.   That Plaintiffs-Relators Brezina and Kelly recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

124.   Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relators Brezina and Kelly hereby demand a trial by jury.

Dated: February 16, 2018

Respectfully submitted,

Patrick J. O'Connell
Texas Bar No. 15179900
Jim Haley
Texas Bar No. 08739500
LAW OFFICES OF PATRICK J. O'CONNELL PLLC
2525 Wallingwood Dr., Bldg 14
Austin, Texas 78746
(512) 852-5918
pat@pjofca.com
jim@pjofca.com

Steve Kardell
Texas Bar No. 11098400
Kardell Law Group
4514 Cole Ave., #600
Dallas, Texas 75205
(214) 306-8045
skardell@kardelllawgroup.com